We have a few motions from the bench, and I think, Judge Lurie, you have the first one. Thank you, Chief Judge. I would like to move the admission of Blair A. Silver, who was a member of the Bar in good standing of the highest courts of New York and the District of Columbia. I have knowledge of his credentials, and I'm satisfied that he possesses the necessary qualifications. That's what I'm supposed to say. I've said it. I will embellish on that to state that Blair has been my law clerk for more than a year and a half, and will continue for another five months. He's been an excellent law clerk. He is very smart. He is very knowledgeable. He's been a pleasure to work with, and I have no doubt that he'll be an outstanding lawyer, and that he'll be appearing before us just a few feet from where he is now. So I move his admission. How could we turn down such an eloquent motion? Now let's see if I can be as fortunate. I will give the presiding chair to Judge Lurie, and I would like to make a motion. Chief Judge, please make your motion. Would you stand? This is James Patrick Hughes, and I would like to move his admission. He's a member in good standing of the Bar of the District of Columbia and California, and I would second all the wonderful things Judge Lurie said about his clerk, and say that Jim has been a fast service to me and to the entire court, and it'll be a pleasure to watch his career as he succeeds going forward, and I would move his admission. Let me consult with my panel. Do we need any discussion? It looks like I'm the swing vote, since you're each conflicted off of voting for one or the other, but I happily join. We grant the motion. I think both of the presiding individuals now ask that the oath be administered. Thank you. Thank you. Mr. Lee, I think we'll begin with Apotex v. Cephalon. May it please the court. My name is Bill Lee, and together with Andrew Danforth, I represent Cephalon. I would like to focus my argument today on the equitable conduct finding for two reasons. First, the finding has enormous implications for the individuals involved. As the court knows, a practitioner admitted to the PTO who has been adjudicated guilty of inequitable conduct must report that finding to the Patent Office. Mr. Lee, we understand why you're leading off here and in your brief with inequitable conduct, but we also have validity issues here. Yes, Your Honor. And do I understand correctly that Lafon gave to Cephalon, transmitted to Cephalon, a composition that basically matches the claim? And therefore, why isn't the patent invalid under 102F on the ground that Cephalon did not, in fact, invent the subject matter? Your Honor, two answers to the question. The first is that under 102F, you need to have a conception of the invention and then a transmission of the invention. The invention here and the patent keys were clear. They thought their invention was the discovery that there was a particle size threshold and that that had... Well, that's an advantage. It may be relevant to the patentability under perhaps Section 103, but that advantage isn't in the claim. The claim is a composition claim and wasn't that composition transmitted? Well, Your Honor, two things. The first thing is when we refer to the claim, there are actually multiple claims that were an issue and the district court never distinguished among them. Half of them are actually method claims. They're method of use claims. If you go to the asserted claims, which are claims 1 through 14 and 16, there are for sure composition claims, but there are for sure method claims. If we focus on 102F, which is derivation, you can't derive an invention from someone who doesn't appreciate it or understand it. You're talking about advantages again. No, Your Honor. Didn't they know, didn't Lafon know that what they were transmitting was a composition 95% of which had particle size of less than 200 microns? Your Honor, they had sent one lot that had 95% below that number, but they never appreciated that that was the number. They had one lot that was below about 160. And I think the fact that we have, if you look at what Lafon did, the two boxes the district court put it in are critically important. One is the derivation box that you've identified. You can't derive something from someone who doesn't appreciate it. And the record was unequivocal that Lafon never appreciated the 200 micron or about 200 micron threshold. Let me ask you about the on sale bar. Wasn't there an agreement for a future sale even with a price specified? Your Honor, the key, and I think this is the key on the on sale bar, is at page A29 of the district court's decision. At page A29, the district court finds that the methanol was on sale because, he says, just like Enzo, there was for the clinical trial portions, there was a price. It was for free. That's simply not correct. In Enzo, in this court's opinion, the court was very clear that one of the bases for the 102B on sale bar was the fact that the clinical trial material was in fact paid for at cost. The distinction here on the face of the supply and license agreement is that was free of charge. But the future commercial material was on sale. There was an offer for sale. It was agreed to by virtue of the execution of the contract. He's accepted. Your Honor, it was contingent upon FDA approval, and that is much more like a lawn. If you adopt the district court's conclusion that the mere commercial nature of an agreement where someone supplies material free of charge, there's going to be clinical trials. If the clinical trials are successful, and this court knows that many times they're not, that there then will be commercial sales, then a lawn would have been an offer for sale. It's a contingent offer? No, Your Honor. I think that this is why I focus on A29, because the linchpin of the district court's finding was that both in Enzo and in this case, the clinical materials were supplied for free, and the consideration was conducting clinical trials. Well, that would have been true in a lawn as well. And without a doubt, Your Honor, let me say two things, and then I can tie it to the inequitable conduct finding. There are arguments to be made both ways, as we've had, on how you characterize that supply and license agreement. We think a district court opinion that characterizes it in one way, which is correct, that we sold it free of charge, but then says he's reaching a decision because one of this court's decisions has an identical set of facts, and that's simply not true, makes that finding clearly erroneous. But I think, Your Honor, to go back, and I'd like to go back to the characterization you said of advantages. The patentees were very clear in this case. Now, they might have been wrong, but they said, first I'll say this, it was 20 years ago. They say explicitly in the summary of the invention that this invention is the discovery that there's a threshold, and if you manage the particle size distribution, there are potency and efficacy advantages. But that gets into the method claim, a method of achieving that objective. Your Honor, I actually think it's both. And I think a lot of what happened here can be explained, and then I think requires a different determination under Therosense is this. The patentees said expressly, both in the summary of the invention and in the detailed description, we think our invention is the discovery that the size of modafinil particles is important to potency and efficacy. Now, the court knows better than I, but much of the law on whether you have to appreciate the invention actually was developed in the year 2000 to 2005. This was 1993. They say what they thought the invention was, and then, Your Honor, if the court looks, and we would ask the court to look at A12-838-39. This is actually a contemporaneously prepared memo by one of the people accused of inequitable conduct, Dr. Gravel. And he says to Lafon— Actually, I want to understand. Sure. You're only making this argument as it relates to inequitable conduct, right? I mean, you're not saying that we should say that what you appreciated in 1980 versus what you might appreciate now changes the nature of what you've claimed. Your Honor, that's correct. I think there are two parts to the answer for sure. This goes to inequitable conduct and whether their understanding of what they were claiming has a reasonable explanation. But in terms of derivation, you claimed the compound. You didn't claim appreciating that there was a benefit from this. You claimed the actual physical thing that had been provided to you. We claimed two things, Your Honor. We claimed the compound and then the method of using the compound in specific formulations and in specific ways to treat specific disease conditions. And they were all collapsed into a single inequitable conduct finding without addressing them at all separately. But there is the Evitrogen decision back in 2005 which suggests appreciation in court for 102-D purposes. I think the question of whether you have to, if it's a 102-F derivation defense, whether you have to in fact appreciate the benefits of the invention before you can communicate it is an open question and a substantial one. And what about the Fox Group? Are you familiar with our decision on Fox Group? Yes, Your Honor. But I don't think that if you take what the district court here said was communication, the communication here was the mere delivery of lot 003. I don't think that decision makes that a communication of the idea. But to come back to it, I think the Fox Group decision says all you have to appreciate is that you have the thing with the physical property. The question, Your Honor, is what's the thing? And if the thing is I have modafinil and it has a particle size range, maybe. But the claim says the particle size range with 95% of the particles, less than about 200 microns. But you knew you had that. We knew we had that. They didn't. And in fact, Your Honor. But they're the ones who gave it to you. They gave it to us. And here's the sequence, Your Honor. They give it to us. We put it into clinical trials. The clinical trials are successful. We go to the next round of clinical trials and we ratchet up the dose to 800 milligrams. And there's a severe cardiac event which causes the clinical trials to stop, which the court knows is a significant event. But wait. The district court made a specific finding that that wasn't really unexpected because the same thing had happened in the earlier trial. And this is respectfully, and I understand the district court spent a fair amount of time, it's just not correct. If Your Honor looks at what was cited, the specific exhibits were cited, they actually were three different exhibits. One said there were minimal effects. One said that it was something that has passed. And the other said it was insignificant. Even the testimony from your own witnesses said, well, yeah, it wasn't that it was unexpected, despite the fact that's what we said to the PTO. What it was was that we didn't expect it to be this bad. Your Honor, that's not an unfair characterization. And I think in that context, go back to the inequitable conduct issue, and you're right, that's our focus. That's our focus because the product has gone generic. The infringement issue we're not even appealing to because the product's gone generic, the market has gone generic. We are appealing the validity issues because they relate in part to the inequitable conduct issue. But the inequitable conduct issue, we think, is key, both for the personal reasons I articulated, and because Apotex says that it's a binding factual predicate for the pending antitrust case. And if we focus on that, and we focus on the decisions of this court in Ferrocent, Exergen, and CalPAR, there is error, both legally and factually. The legal errors are the person who is charged with inequitable conduct is never identified. Well, I've read all the cases that you cite, and while it's true with 9b that you've got to have the who, what, where, the trial court does identify particular persons that it concludes acted in their capacity as representatives of Cephalon. So maybe the trial court was being a little bit kind by not tagging them individually, but it's clear who he was looking at. Your Honor, I don't think it is that clear, and I know I'm on my rebuttal time, but could I finish the answer to this question? Please. Your Honor, here's the problem with the manner in which it was addressed. And I think Exergen says you have to plead specifically who it was, what they know, and what they did. Right, but that doesn't say that you have to have a finding that only one person engages in inequitable conduct. It could be a group of people all acting on behalf of the same entity. It can be, but you have to identify it for the individuals. It's an intent issue. The intent is the intent of an individual. So let me give you just two examples because I'm in my rebuttal time. The first is one of the primary focuses. Take your time. We need the time on this case. Okay. One of the primary focuses of the district court's opinion and of Apotek's brief is a statement by a very well-respected practitioner at a very prominent patent firm. They claim that he misrepresented what was done during the course of making the invention. That person, Your Honor, is not accused of inequitable conduct. The person who made the statement is not. And the charge that's made to you is that someone else who didn't make that statement, who was in-house at the time, is actually guilty of inequitable conduct. But that's not the only thing that the court could do. And you could see that the statement made was an affirmative falsehood. You don't admit that he intended. You say it was a mistake on the part of this prominent practitioner. But it was clearly a false statement. Your Honor, I actually, respectfully, I think if you look at two things. If you look at the preceding page where he describes the manner in which the invention was made, and then if you look at the other parts of the record where he actually rephrases what he said in that particular statement, and he says no one had made the invention, which is the discovery of the particle size, there's a reason he's not accused of inequitable conduct. But there are really, there are four things that are cited in the two pages on intent. That's one, and that's a principal focus. So you have something that's not even authored by the people who are charged. You have the Burgone Memorandum, which both Abbott Tax and the District Court say are susceptible to multiple different interpretations. You have the Schecht Declaration, Your Honor, and the District Court said that he found intent because the Schecht Declaration discloses information that wasn't disclosed in the Patent Office. Now, I think what he meant was it wasn't disclosed in the specification, but it was disclosed in the Patent Office because it was filed with the Patent Office. That can't show intent. And then, Your Honor, the last one that I'll provide as an example, and this is the reason why even accepting, I accept your statement that you can have more than one person who's engaged in inequitable conduct, but if you are, given the consequences for those people, for each of them, effigy requires pleading and proof. They're the person, they knew it was material, and here's what they did. Dr. Gravel, now not a patent practitioner, was accused of inequitable conduct. There's one finding of fact, Your Honor. It's, I think it's 112, which is what they based the finding on Dr. Gravel. Now, that cites to a declaration, not of Dr. Gravel, but of Dr. Schecht, and the finding is incorrect because it's not even Dr. Schecht's declaration. It's Dr. Graham. So if we set aside Mr. Clark. Well, to prove inequitable conduct and to prove intent, it's almost impossible to directly prove improper intent because no one's going to admit that I purposely lied. So you were talking about a circumstantial case. For sure. And as Fair Assent itself says, you can, while you can't use a sliding scale, the level of materiality is certainly relevant to the overall question of intent. And here we've got patents invalid, at least on several grounds that the trial court found and found that it never would have issued if basic facts had been disclosed, right? Yeah. Well, Your Honor, that's taking, there's certainly, there are four grounds for sure. I don't, I don't know that any of those required the disclosure of any more than was in fact disclosed, but it's been invalidated on four grounds. And one of the reasons I'm focusing on inequitable conduct quite apart from the practical implications of what's confronting the court or the court's decision is this. We understand that if there are four grounds, we'd have to basically get you to reverse on all four grounds. We think that each of them has some problems. I think the most important issue within each of the different findings are the places, like on the on-sale bar, where there's simply a finding that's incorrect. And when you have people like the prominent private practitioner, Mr. Burgone, who was an in-house patent lawyer at the time, Dr. Graybell, it is important to identify them. I think it's required under CalCard and Exergen. It's important to show they had knowledge of materiality. And then I think, Your Honor, to close, if. But it would seem then at best what you could possibly hope for from us, since this is up here in a 54B, is a remand for the court to make additional fact-finding. Your Honor, that is, I think, one and the most obvious remedy, because he hasn't made the factual findings that are required. There is nothing before you that identifies the person, the claim, the knowledge of materiality. I think that's an awfully broad statement, Mr. Lee. Nothing before us in this record? There's nothing that identifies the knowledge of materiality and attributes it to the person. So there's nothing that identifies this is the person who did it. This is the person. This is their knowledge of materiality. And this is the consequence. And, Your Honor, the very best example is this. The district court relied upon basically four sets of facts, which you've addressed in our reply brief. In their brief, Apotex is actually urging you to affirm an equitable conduct on the basis of other facts that the district court did not rely upon. And to the extent we have pointed out legal and factual problems with these other findings, the argument is, well, they're superficial, or it's form over substance. But they're not, and they're not because of the consequences to the individual. Thank you, Your Honor. Thank you, Mr. Lee. We'll restore your rebuttal time. Mr. Breisblatt. Can you give Mr. Breisblatt another five minutes, if he needs to use it at least? Hi. The police of the court. Robert Breisblatt on behalf of Apotex. With me is Brian Sotokoff. We're from the firm of Catton, Mutchin, and Rosenman. The police of the court. The district court's decision with 114 findings of theft. Cites to the record. It is complete, and is in fact an indictment of what it was that Cephalon did in this case. As to the two individuals, there are cites to both Mr. Gribau and Mr. Bergone, what they knew. Just for a quick example, when Mr. Lee refers to Mr. Clark, and makes that statement about the inventor's changed particle size, at A2357, Mr. Bergone makes it quite clear that he was the scrivener of the patent, and as part of the process and the prosecution, he had to draft responses to rejections and concerns of the patent office. Mr. Bergone controlled the entire prosecution. He knew because when he first arrived at Cephalon, he had a conversation with Mr. Gribau, where he learned about the shipment of the product, the supply agreement, and all the work Lafon had done. Let me start off, because I think there might have been a little bit of a misstatement, but I think it's pretty clear that in July of 1993, Lafon not only shipped tablets, which would be the pharmaceutical product, containing the material that met every claim in this patent, tablets to be used in clinical testing, they also shipped part of Lot 3, which was the API. So Lafon made the tablets. They had also used small particle tablets in clinical testing in France. They knew exactly what they had. They measured every lot of modafinil they produced, and they sent those measurements to Cephalon in November of 1993. And you can see that they measured every lot of modafinil they produced, and the number of those lots, not just 003, but 5-2435, which was used in clinical testing in Europe, was small particle. That met every claim element. There was a lot of debate over whether there were substantial material omissions here. I mean, clearly there were repetitive, substantial material omissions. The real question is whether or not there's a finding of intent, which our case law requires. One of the things that surprised me here is while they may be implied, the court never made any specific credibility determinations, and that is a bit surprising when you're talking about intent and you're talking about a trial that was as extensive as the one here. Why do you think that is? Well, the court actually did make implied findings of credibility. For example, the court rejected this claim of confidentiality. He rejected it after hearing the testimony of Mr. Grebow, who was specifically cross-examined on the confidentiality provisions of the license agreement. All right. In what words do you say he rejected that claim? Obviously he didn't find it to be the most reasonable inference, but his factual findings are not as clear as one would like them to be. Well, he finds that there was, in fact, this sale. He finds that it should have been reported to the patent office. He finds that Grebow knew about the reduction of the particle size on behalf of La Fon and never told the patent office about it. All of those are important findings that go to the intent to deceive. He found that all through the patent application and the patent process, they artfully wrote it to disguise the role of La Fon in manufacturing small particle modophenol, which was, in fact, what was claimed in this patent, and that each of those declarations purposely avoided that. Mr. Lee spent a lot of time telling us that they thought the invention wasn't the small particle size, but this threshold. If that's the case, do we still have materiality findings? Yes, we do, because La Fon knew exactly what they were doing, and the court looks at the chart that was prepared, which is A4000. What A4000 tells us is fascinating. So this is what La Fon was doing. After 1986, every lot they produced, with one exception, was small particle modophenol, and they knew it. And how do we know it? Because when we look at... Yes, yes, but remember, the question isn't... Let's assume for a second they made a claiming error, they claimed a small particle composition and didn't make clear that they were really claiming a method or a threshold. But let's assume for a second that they think their invention is the threshold and the method, even if they claimed it wrong. Where do we stand then on both intent and materiality? We're still in the same place, and that is La Fon understood it. And we can find that directly... at the threshold. Now, does La Fon use the words threshold? Yes, that's what I'm wondering. Is there some place where we'll see La Fon telling us there's a cut-off at this point where the predictability is better? Here's what they tell us, and this is what I can tell the court. Mr. Gribau writes a memo on October 6, 1992. It said A4081. A4081. And the district court relies on this. Mr. Gribau writes the memo on October 6, 1992 after visiting La Fon's laboratory in Paris. He's still negotiating. He doesn't know if Ceplan's going to buy this product to sell in the United States, which they do under the supply agreement or not. And what he did is he writes the statement that the formulation was changed during the development. This is talking about what La Fon tells him. Our understanding from the conversation to be confirmed was that the change involved decreasing the particle size of modafinil. No formulation change. All key clinical studies were said to be conducted with the later formulation. And when we look at the chart, which is the evidence in the record as to what La Fon did starting in January 1989, three years before this meeting, before they talked with Mr. Gribau, they are producing, starting with 5-2435, which was never disclosed to the patent office by Ceplan, though they knew about it, they're producing modafinil less than 130. And they do that consistently. Less than 130, less than 164, less than 164, 130, 130, less than 130. What can we say about that? Anyone looking at that sees that there is a reason they're doing this. This isn't the pharmaceutical company making a mistake. They do it in consecutive batches with one exception, and that's 2-3 that they do on January 1993, where it rises a little bit above, and they even explain that. Because when they send their particle size measurements in November to Mr. Gribau, what do they say? They say that one was recrystallized. And this is from the November 10th at A12840, specifically at page A12841,  particle size analysis of each batch of modafinil from batch A1939 to batch 005 are presented in the following pages. All data was obtained, and they tell us how they obtained it in Zeta. Results were collected in Table 1 and compared in Figures 1 and 2. One can observe... So you're saying that the claims of the patent are invalid under 102F. Correct. What about the mythic claims? The mythic claims are using the pharmaceutical process, which they didn't challenge the mythic claims in the brief, but if we look at the mythic claims, they were on sale because Lafon told Cephalonil modafinil's utility is an effective treatment in narcolepsy at daily doses of 200 to 400 milligrams. In other words, it's the original use. The use never changed. You're making it more effective by using a lower particle size. Well, the use never changes. Whether you're using small particle or large particle, you're using it to treat narcolepsy. But one of the things that Lafon did is it specifically tested the small particle, the 2435, and the judge finds this and found that it was effective in treating narcolepsy. So it was determined before it was ever shipped to Cephalon, and it was determined by Lafon. What about the on sale? Mr. Lee makes a distinction between this situation and Enso. This is specifically online with Enso. Here you have a signed contract, something you never had in Elan. Elan was just letters sent out to a number of companies. Here you have a signed contract between two parties. It's a requirements contract. Lafon promises to supply Cephalon with all the modafinil... But for clinical use it was free. I'm sorry, say again? For clinical purpose use it was free. As the judge noted, nothing was free because in the license agreement, Cephalon was required to conduct the clinical test to get approval, and the testimony at trial was that it was well known among Cephalon that that was going to cost over a million dollars to do the clinical trials. But this was conditional on FDA approval, wasn't it? Well, as it was if I recall correctly in Enso's. It wasn't a current sale. It was a conditional future sale. It was... No, I don't think it was... It was a requirements contract. Yes, there was a condition that it be approved by the FDA, and in fact they used Lafon's testing to get that approval with the IND. But if I recall correctly in Enso's, there was also a requirement that it be approved in the future, and that didn't stop the court from finding it was a contract, and that's exactly the situation we have here. This is a written contract signed by two parties, and when the product gets delivered in July, the product that's delivered in July for the clinical testing meets every one of the claimant. Now, the contract refers to pricing. Yes. So it almost looks like a royalty, a royalty of 11% on sales. Is that really a sales price? That was a sales price, because what you don't know, and that's why it's tied to a percentage of your net sales, obviously, when you're selling a pharmaceutical, you don't know yet what your pricing is going to be, how much profit you're going to make, and so what they said is you pay us 11% of our net sales. We're selling this in France. You pay us as for the product, like a sales agreement, a regular sales agreement. This time they're taking a certain percentage of the product. In fact, it's closer to a sales agreement. We hire a sales agent, and you say you can keep a certain percentage of what your net sales are. Mr. Breisblatt, would you do me a favor and take Dr. Gribau, Dr. Burgund, and Mr. Clark, and just tell me what is your best evidence of specific intent. Remember, specific intent to deceive on each one of those three.  Best evidence. So, Dr. Gribau was aware of the receipt of the Lafon small particle that met all the claims that he did. He was well aware of that and never disclosed it to the patent office as the inventor. He never, in any of his declarations, said, we received the small particle modafinil from Lafon. It met all of our claim elements. He never disclosed that to the patent office. He knew it. He knew it from the receipt. He knew that Lafon, from the minutes that we've seen, he knew that Lafon had tested the small particle. He knew that they had used it in the clinical test. So, when we look at the patent, and it says that they only tested large modafinil in the foreign test, he knew that was false, because he himself did the IND, the investigative new drug application, which cited to the use of 5-2435, which was small particle modafinil, that the French used in their studies. So, he knew that, and the judge cites to that. He knew that Lafon had been consistently reducing particle size, which was through the notes that he had of all these meetings. He knew all of that and never disclosed any of it to the patent office. As to Mr. Bergoun, Mr. Bergoun knew that, and I'd like to turn to the Bergoun memo, because I think it's rare that we get a document quite as revealing. So, that's at A12855. And remember, Bergoun gets there, I believe he said in July of 1994 in his testimony, in his deposition, and the judge got to observe both Dr. Gribau on the stand and judge what he was going to believe and how he responded to questions, and he saw the videotaped deposition of Mr. Bergoun. And so what we have is a memo that's written by Mr. Bergoun, and it's written on or about October 5th, 1994. And what we learn from the memo is that Mr. Bergoun was well aware that they had received every measurement that Lafon had made of its particle size, showing small particle size and large particle size. And how do we know that? Well, he says it. How do we know this application is, in quotation marks, unusual? In the sense that we did not want to include any of Lafon's data. That's important. So he knew all about Lafon's data. That meant he knew about the clinical testing of the small particle modofanil in European tests. He knew about the measurements of every batch of modofanil that was made. He knew that they received it from... Well, obviously they took a license to this compound from Lafon. Of course they knew that it was active and effective. As to what modofanil does, but not to the small particle. They never mention that Lafon, in fact, was the creator of the small particle modofanil. And that's the misleading part. And that's what the judge found. The judge didn't find that they simply hid Lafon's role in modofanil. He specifically says every time he makes that statement that their role in the claimed invention, their role in the small particle modofanil. There's no question that. Because there was still a modofanil patent held by Lafon. Oh, they disclosed that, but they didn't disclose that Lafon had reduced the particle size to that which they're claiming. And that's the problem. And it is pervasive, as the judge found, throughout this application. That's the finding the judge made. It just wasn't one statement. It just wasn't one part of the patent prosecution. It is consistent throughout. They purposely hid Lafon's role in the creation of what is claimed, the small particle modofanil. But intent was inferred, right? Well, intent is always... Well, as I say, it's rare that you get a confession, per se. And I might be looking at this in a different way, but I look at, frankly, the October 5, 1994 memo as about as close as you're going to find as a confession in a patent case. When someone says that we remeasured the data so we didn't have to disclose it to the patent office, and the judge rejects the confidentiality argument because if you look at the license agreement, it says you have to be honest to government agencies. And even Dr. Grebo in cross-examination denied that that was the reason they didn't disclose it. Which document was it that said we remeasured it and we didn't have to disclose it to the PTO? A12855PTX091, the October 5, 1994 memo by Rick Bragun to the executive committee, where he thanks everyone, and at the end, he actually gives us the reason why Ceplan did this. Without the efforts of this team, an opportunity which may provide significant benefits to Ceplan would have been lost. And for this reason, I thank the team for its efforts and assistance. And what was it? Well, the remeasuring of particle size so they wouldn't have to, in fact, he says it, Tom Leisner reanalyzed each of the modafinil lots that are in our possession. He determined particle size using our instruments so that we would not have to rely upon the particle size data provided to us by LaPont. They had the particle size data from LaPont. They knew what it was. Mr. Clark, you've talked about Grebeau, Bragun, Mr. Clark. Correct. Mr. Clark's statement that Mr. Lee pointed to, which is in response to an office action, specifically, and I'd like to read it, furthermore it is probative of non-obviousness that materials which are the subject of the invention had long been known, but had never before been modified as the inventors have done. There's no if, buts, or question about that statement. He's making the statement that the inventors modified the modafinil. And we know that's false. At trial, Grebeau amended it. They never did anything to this modafinil. They just measured it, just like LaPont had done. Now, is there an excuse for Clark? All we know is that everything he did was reviewed by Bragun who knew the truth. So either Clark knew it was a false statement when he made it, which would make him guilty of inequitable conduct, or Bragun let him make that statement knowing it was false because Bragun said, I reviewed everything that was done in the patent office. I'm the one. And that's Mr. Clark. If we say Mr. Clark is not guilty of inequitable conduct and he just wrote this and it was never corrected by Bragun, it further goes to Bragun's role in this and why Bragun... Well, do you agree with Mr. Lee that you didn't really accuse Mr. Clark of inequitable conduct, that that was merely evidence of Bragun's... I think that could be a reading of it. I think the statements made, the judge points to this statement as being something that shows part of the pervasive prosecution history to get this patent with false statements and misleading statements. Now, do we want to say it was Clark who did this? Bragun says, I was with Clark when he came and he interviewed the inventors, I reviewed everything, then it's Bragun and maybe Clark can be excused for this. But that statement is a glaring misstatement. It is simply false. Before you sit down, would you re-answer a question? If the invention is perceived by them as the threshold, regardless of the way it was claimed for now, if they perceived it as the threshold, is there still the same materiality and intent? Yes. Because they should have told the patent office what Lafon did, that Lafon, in fact, was creating these particle-sized products, they were putting it into modafinil that was being used in clinical tests. I don't know how you ignore that. You can't. I don't care if you say the threshold was 160 or the threshold was 180. They got a product from Lafon, Lafon had measured, knew what the size was, produced it consistently, provided them with those measurements, and they never disclosed it. Okay. Thank you very much. I appreciate it. Thank you. Thank you. Mr. Lee? Let me begin where Mr. Price-Blood ended. I don't think that's correct. If they believed that the invention was the appreciation of the threshold, then everything that occurred has a reasonable explanation. And that's exactly what they believed because they said it, and it's what the contemporaneous documents show. To go to the question, Your Honor. How do you deal with the fact, though, that we are reviewing the trial court's factual findings for clear error and we're reviewing the ultimate conclusion under an abuse of discretion standard? I address it in two ways, Your Honor. There are two legal errors. The fact that they have not identified the specific people and specific acts is the legal error. And here's the best example. What is Mr. Clark supposed to do if this decision is affirmed? You did not get an answer as to whether he's accused or not. The honest answer is he wasn't accused in the complaint. He wasn't accused in the trial. The first time there's been any suggestion that he had the intent and is guilty of inactive conduct was today. Does he report to the PTO if this is affirmed? That's the legal error. The factual error is, Your Honor, the district court did issue the long findings that Mr. Price-Blood talked about. There are some that are just flat out in error. I don't know how he got there, but let me give you an example, if I could, that goes to a question that Judge Rader and you asked Mr. Price-Blood. Lafon did not appreciate the threshold. He didn't even appreciate the threshold. And I'll give you two citations that will demonstrate the fact contemporaneously. At A2951. 2951. 2951, Your Honor. A Lafon scientist, and this is consistent with all the Lafon people who testified, states, quote, at the time we had not thought of the correlations. That is deposition testimony of one of the Lafon scientists. To demonstrate that she, in fact, was correct, if you consider A12589. Well, what that testimony said was that we did not appreciate that there was such a correlation with bioavailability. But they specifically told Cephalon, even long before, that they were testing it because they realized the small particle size related directly to solubility. And solubility and bioavailability do go hand in hand, don't they? Your Honor, there are a couple of things there. The first thing is that they never came out, they never told them two things. One is that there was a threshold below which the relationship, the traditional relationship between particle size and bioavailability, which is the smaller the particle size, the more bioavailability it vanishes. And they never told them. But they did tell them that they had found that smaller particle size was directly relevant to solubility, did they not? They did. And, Your Honor, that actually is helpful to us. And can I explain why? Lafon made the particles. We say in the past, you know, we cite five Lafon tests. We say that they're the licensure. We say that they ran the European test. We say that we're running the U.S. test as their licensee. They had the patent, the 290 patent on the particle. They made large particle size. They made small particle size. They never discovered the threshold or its consequences. And the scientists said so. And then, most importantly, Your Honor, at A12589, which is November 25, 1993, this is a month after Stefan has written and said, we've got a big problem. We think we've discovered the solution. And the solution is small particle size controlled below a threshold. That should not come as news to anyone skilled in the art. Small particle size always increases solubility. What the particular threshold was is a matter of determining that. Your Honor, that actually is what the key to the invention was here and the answer to Judge Rader's question because the Schecht Declaration, the declaration that the district court said was not before the patent office, it says that the threshold was key, and it was particularly key because below that threshold, that traditional relationship you just described disappears. So that if you can control it below, the 95% below, you not only get better potency, but you get better control over solubility because the traditional relationship disappears. Now, the district court disregarded that because he thought it was inappropriate to put it in in the form of a declaration, but it was not. May I ask two questions? One, is it reasonable for a patent attorney to think that he's claiming a threshold when he puts forth a composition claim such as we have? The answer, Your Honor, is in 1993, the answer is yes, and particularly if you do the following. If you say explicitly as they do in the application and in the specification at column 2, lines 11 to 13, and columns 4, lines 54 to 56, our invention is discovery the threshold. Now, Your Honor, they may be wrong. Twenty years later, they may have just been wrong in assuming what the invention was. But, Your Honor, we'll see. If they actually had modified the method for making modafinil particles, there would have been a claim there for the new process of making modafinil particles. Next question. Even if they thought the invention was the threshold, they didn't disclose anything about their activities with Lafon. And you heard Mr. Breisflat return to that point over and over again. Right. They had all this information. They didn't even breathe a hint of it. Your Honor, two answers to that question. First, it's not accurate that they didn't breathe a hint of it. Excuse me. I'm overstating, but I'm trying to get you to respond. I think that's a fair explanation. Well, we don't want you to spend too much on the first part, you're going to say, which is we know that they mentioned the patent. We know they mentioned that they were licensee. But let's get to the point that your friend on the other side was focusing on, which is they didn't breathe a hint about the fact that the small particle size batches were received from Lafon. Yes, there you go. They did not disclose that. And, Your Honor, this goes back to Judge Rader's question to Mr. Breisflat. Rightly or wrongly, if they believed that the invention was the discovery of the particle size threshold and the elimination of the traditional relationship between particle size and bioavailability, it didn't matter who made them. It didn't matter where they came from. It was that discovery. And the reason I keep coming back to this is that if the court considers the specification, they were open and honest about what they thought the invention was. Now, they may have gotten it wrong. They may have claimed it incorrectly. But everything that they did, viewed through that prism, has, I actually think, you can actually view it through that prism and there is a reasonable explanation. There are certainly. But the trial judge decided that that was not a fair prism. Your Honor, and that was error. Because if you're trying to. That's not legal error. You're saying that he just factually didn't, he didn't believe them, so therefore we have to reverse? No. I think, Your Honor, there are two legal errors that are completely separate from that. One is the failure to identify individuals. And the second is the failure to identify the knowledge. And this goes to, for instance, the laundry list of what Mr. Graybell said. There's no indication that he intended to omit the disclosure of that information with intent. All they've shown is knowledge. And for each of these folks, the district court has not identified person or knowledge of materiality. I do think, Your Honor, it would be a legal error if you're evaluating intent not to put yourself back in the position of the people in 1993 making the statement and to try to disassemble it in hindsight. And as I said, I think if Your Honor considers the specification and if you look at the two documents that I identified that were contemporaneous, they describe to LaFond this is their intention. These are all factual arguments that you made to the trial court. And, Your Honor, the district court made some clearly erroneous findings. Was the supply agreement disclosed to the examiner? No, Your Honor. And that potentially might have been a bar. It might be, Your Honor, but then the question is, let me go back to the intent question. If they thought the invention was the discovery of the threshold, LaFond, by its own admission, had nothing to do with that. But supplying of the material. Supplying, it wouldn't matter where you got the material. It's the discovery of the threshold. Mr. Lee, Mr. Bryce Blatt, this court does not find itself in the business of commending attorneys, but you served us very well today. Thank you. Our next case is